Okay, we'll begin with Mr. Lynch on behalf of the defendant Diaz Diaz. Mr. Lynch, you're going to have eight minutes with two minutes of rebuttal. Okay, all right, well then let's go ahead and proceed. Thank you. Thank you, Your Honor. May it please the Court, I'm Leonard Morales. I represent Mr. Martín Pérez Marufo in this matter. As the Court has mentioned, I know the Court has read the briefs and knows the facts and circumstances, and actually these cases have come before this Court before on appeal. The primary issue goes to the conviction on Count 5, the conspiracy to kill a person in a foreign country under 18 U.S.C. 956a1. As the Court's aware, there's two primary elements at play here in Mr. Pérez Marufo's appeal. One of those is one of the conspirators committed an overt act within the United States to affect the object of the conspiracy, and the other is that one of the co-conspirators was within the United States at the time of the agreement. Now, to cut to the chase here, members of the Court, the operative fact that the government presented at trial and in its reply brief beginning on page 17 is that some message, some communication, was exchanged between the Ciudad Juárez wing of the Barrio Azteca to the El Paso wing of the Barrio Azteca to look into the Texas license plate of a white pilot. Counsel, how can you distinguish this case from United States v. Portillo, where the Court held that circumstantial evidence of a defendant's role in an organization or a gang, as in this case, can support a RICO conviction or an aiding and abetting conviction? Judge, the issue in this instance goes to the count in Count 5, not necessarily to the RICO. I think the RICO is a different count and has different elements. Some are similar, but this one in particular requires these two elements, which show that someone has to be in the United States committing the overt act. I think that's where the difference lies in Count 5 as opposed to Count 1 of the conviction. You're arguing the same thing. In essence, but it operates differently under Count 5. And the issue under Count 5, again, is that we have to look at the communication. Must it have gone north, and what's the timing of this communication? And make no mistake, this is basically the government's case on this count of conviction, on Count 5, is when did this communication take place? They've offered nothing else. There's no alternative theory. There's no other line of proof. There's just this communication, this phone call, text message, e-mail, radio communication, whatever it is. They've hung their hat on this point. And what everyone here seems to miss with regard to Count 5, and perhaps even I could have been more direct in my brief in stating this, is assuming this communication happened, when did it happen? Now, I'm sure the court would agree that a conspiracy does not form after it occurs. That, however, in the evidence established at trial, showed that the communication from Mr. Gallegos Castellon Benny to Chino Valles about the license plate of the white pilot happened after the murders. They wanted to find out who was in the vehicles and was anyone killed. And who did they call? They actually called the Almeda wing of the Juarez Police Department. They did not call El Paso. Counsel, are you making the same argument that was made in the Castellon appeal, co-defendant? And if you are, why would we entertain it as to your client, since the court didn't accept it on Mr. Castellon's appeal? Your Honor, I've looked at that case, and in preparation for trial in that case, I was the trial attorney for Mr. Perez-Marufo, and I read the entire trial transcript of Mr. Gallegos' trial, and I did look at that case specifically as to this point and these elements, and I was waiting for the government to actually fix this point. I was waiting for them to actually put on more evidence with regard to that, because I would put to this court, Judge, that Mr. Gallegos' case, when it came before the Fifth Circuit, it was wrongly decided. Why was it wrongly decided? Because the court didn't have all the information. In that trial, the timing, when this occurred, wasn't very clear in the trial, in the evidence that was presented. Yes, Your Honor. Yes, Your Honor, that's what I'm talking about. When did this communication happen? I'll remind the court that what occurred was Mr. Gallegos Castellon-Benny, who was a Barrio Azteca lieutenant, lives in Juarez, Mexico, in one of the colonias, one of the neighborhoods, a suburb, if you will. He believed he observed a white pilot that was driving up and down his street. Now, there was some suspicion that members of the Sinaloa cartel, a rival cartel, were casing his neighborhood, looking for him. Now, he put out on the radio to keep an eye out for a white pilot. Now, at that point, as I understand the facts and evidence as they occurred in trial, these things, there was no license plate, there was no other mention of calling our brother Barrio Azteca up north or anything of that nature. It was merely to keep a lookout for a white pilot. Some weeks later, the same individual, Benny, Arturo Gallegos Castellon, found a white pilot at a party hall in downtown Juarez, Mexico. This is where this chase began of the two vehicles and the subsequent murder of these individuals that occurred in Mexico. Now, after the shooting, there were communications, radio communications, between Mr. Gallegos Castellon to one of his other underlings, Mr. Chino Valles, to look into the license plates and whether or not anyone had been killed. And they reached out to their contacts in the Juarez Police Department, as I understood it,  Now, what we need to look at again is these several exchanges. And again, to begin at page 8 of my brief, but I look at these several exchanges where discussions of the white pilot took place. All of these conversations, these communications, these commands, whatever we want to call them, they all occurred after the murders, trying to find out what had happened. So that communication does not cross into the United States. Again, it goes to the Juarez Police Department. What was the communication before the murders where they said, well, this isn't the right car, but kill him anyway? Those were occurring in real time, Your Honor. Those were communications going from, again, from Benny to these various Sicario hit teams that were following the vehicles in real time. All of them were in Juarez, Mexico. None of them crossed over into the United States. None of these communications were required to cross over. They all occurred in Mexico and not in the United States. But can't we circumstantially link the knowledge that this is not the car with the inquiry prior? Here's the plate. Run the plate. At some point, they run the plate, and then the conversation is relayed back that, no, no, that's not the car. So somebody must have checked, right? Actually, Your Honor, that's not the way it took place. The way it took place was they were pursuing these vehicles. What had caused the confusion, I think, was there were two white vehicles. One was a Toyota RAV4. The other was a white Pilot. They were pursuing both vehicles. Now, the white Pilot had children in the back seat, and that was called in to Benny. There's some children in the back seat. Do we proceed? So he distinguished the cars based on information not relative to the plate. Exactly, Your Honor. The plate issue came up afterwards. This came up afterwards to find out, well, what happened. Again, remember, the hit teams come in, they do their business, and then they leave. Now, I think the members of the body of state at that time wanted to know what had happened, who had been killed. Again, there was confusion as to whether or not these were the right vehicles, and clearly they were not. But nevertheless, they wanted some confirmation as to whether anyone was killed and some information about this Texas license plate, as one of these vehicles had a Texas plate. Actually, both of them did. So in the scheme of these things, they wanted to know what had happened. These occurred after the murder, Judge. Let me ask you, you also raised an issue, since your time is running short, a sentencing issue. What impact does the 2006 amendment to Section 3C1.1 have on your argument about pre-investigation conduct that obstructs justice? Your Honor, I don't believe that it does. I briefed that issue necessarily looking at the facts, not necessarily the case law as it stood. I believe that the facts laid out that the timeline, again, of the investigation is a little cloudy. Well, is there any evidence in the record that suggests that the vehicle was destroyed for some reason other than the fact that it was involved in criminal activity and would be the subject of investigation? It would be disingenuous for me to say otherwise, Judge. No, that was the purpose. I'm not going to try and argue otherwise. That was exactly the purpose. My point in the briefing was merely, again, as to the timeline, the timing of all of this. When did the official investigation begin and when did the, I guess, the door for obstruction, when did the opportunity for obstruction begin? That's the point I was trying to raise, Your Honor. Okay. Thank you. All right. Thank you, Counsel. We'll hear from Mr. Lynch at this time on behalf of the defendant, D.S. Diaz. May it please the Court. I think there are a couple of things here, and while timing has something to do with it, I think what is important is, did the government prove a conspiracy that anyone in the U.S. agreed to? I think that's the critical thing, and that is what distinguishes Castrellon, because in Castrellon, there was evidence that Camelo Castillo, who also testified in this case, testified in Castrellon that calls to El Paso Aztecas were often about hits. There's nothing like that in this case. So even if we assume a call, we don't know if it was in a way that would suggest that there was a hit going on, but more importantly, we don't even have that general culture testimony. So the government is asking us to assume the worst of everyone, and maybe that's fair outside of a court of law, but it's not fair in a court of law. That, I think, is the most critical element that's missing here, where there's no showing that anyone in the United States, in the El Paso Aztecas, agreed to a murder or knew that they were being contacted with the idea that there was to be a murder. There's not a specific evidence of that in this case, and there's not a general cultural evidence, aside from obviously there's a lot of murders going around, but that still, for a court of law, is not what's necessary. And that, I think, is what's missing here. There's some factual things that I'd like to clear up a little bit, if I could. What happened, as Benny said, I found the white pilot. That wasn't the right white pilot, because that one had a Texas plate, and Mr. Salcido's case had a Mexican plate, but Benny was a little jumpy, I guess. He calls out on the radio, and people come. People then pick up white vehicles as they arrive at different times. And my client, Mr. Diaz, radios back, I'm following a Toyota, that's not what we're looking for. And Benny says, kill him anyway. But I think where that's important is on our challenge to the aiding and abetting counts. Because the government makes it sound as if, oh, everyone came together at the party hall and decided they were going to kill them. But that's not what happened. Benny's on the radio. His soldiers are out there. They're coming in one by one. And I think if you look at the testimony of Camelo at 1380 to 1412, and of Lentes at 2231 to 2040, you will see that what happens is Diaz radios. He's coming in. He can help. He sees the white Toyota leaving. He follows that. Then he radios back, hey, this isn't the right car, and Benny says, kill him. Now, he killed the people in the Toyota, and he was found guilty of that, and he should be found guilty of that. But he was nowhere near the Salcido murders. That was done by Perez and his team. Counsel, are you arguing that to aid and abet, to commit that particular count, the defendant had to physically be present when the crime took place? No, I don't think he has to be physically present, Your Honor. There are possible other ways that he could do something that would aid the crime. But I am saying that I don't think the government showed that. The government is suggesting that the aiding and abetting is because they're all headed towards the same place and they all use the same radio frequency. And I don't think that's enough because Perez and Salcido go one way, Diaz and the Toyota go another way. They're really two separate murders. Now, of course, for RICO purposes and in a prior count in this indictment, he's guilty of that. That's the whole point of RICO is to get you for the things that you didn't do but that you're associated with. But for aiding and abetting, he has to participate and facilitate. And I don't think simply being on the same radio frequency and going after a different vehicle and killing a different person is aiding and abetting, to be very specific, the use of a firearm to cause the death of another, which amounts to murder. And that's why I don't think that's why the aiding and abetting count, I think, fails on count 8. It may be a closer call on count 11 because it is a V-car murder, so it's murder in aid of racketeering. We have the same facts in what I would suggest is not an affirmative step, is not a facilitation. But I have to concede that aid of racketeering may hurt. But I think the aiding and abetting argument on count 8 is pretty strong. They raised this argument in the record. I'm sorry, Your Honor? They raised this argument about count 8 in the record. In the record? They just made a general Rule 29, which preserves the issue. In fact, it's better for trial counsel to make nothing but, Your Honor, would you please grant a judgment of acquittal. I can't persuade anyone of that, but nonetheless it remains true. And so by making a general motion for acquittal, it's preserved. And I know that my friend has said it wasn't raised even to that extent, but I think it was. The district court said I am understanding and denying your motions on all counts. So I think it's preserved adequately. And I think, Judge Englehart, part of this may go to what you raised about the Portillo case. Aiding and abetting in that case was in large part because of the leadership roles that Mr. Portillo and Mr. Pike played. That they were the bennies of that case. They knew the structures. They gave the orders. And so for them, the fact of presence or even that they didn't take a particular step to facilitate wasn't as important because their command of it. But we don't have that with Mr. Diaz. Mr. Diaz is a soldier. And on the sentencing, I would suggest that the court should vacate under LORA and send it back for the district court to decide if it wants to impose those three 924J sentences consecutively, now that it can recognize that it has the discretion to impose them concurrently. What sentence does he have for the murders? He has, at the moment, 11 life sentences. So this won't help him? It may help with things like classification in the BOP, things like that. But he's not going to be released any time soon if these counts are vacated or reversed, actually. But I think to sum up the conspiracy, the problem is the government doesn't have proof of a conspiracy. They don't have anyone in the U.S. that had agreed to a murder of any sort. They didn't prove that. All they proved in this case, unlike Castrillon, is that Chino can be inferred to have made the call. That's not enough. Okay. Thank you. You've reserved two minutes for rebuttal. Ms. Barringer, on behalf of the government. May it please the Court, Elizabeth Barringer for the United States. I'm going to first address the Count 5 sufficiency issue. Diaz's counsel, my friend Mr. Lynch, has suggested that the big difference in this case between United States versus Castrillon that this Court has already decided in this case is that there's this testimony that Chino Diaz regularly discussed hits with El Paso. And that's the big difference that led the jury to draw an unreasonable inference that El Paso knew about and participated in the agreement. And there's two problems with that argument. The first is we have some very similar testimony in this trial. We may not have that exact testimony. But we do have testimony that Diaz routinely made calls to El Paso about B.A. business. That's on 1411. And B.A. business, according to the trial testimony, is about drugs and killing. I direct the Court's attention to 1301, 1893, and 1940. So that evidence gives the jury some evidence to understand what Chino Diaz is calling El Paso about, just as in the Castrillon case. And other, as sort of hinted at by Judge Engelhardt, there is a wealth of evidence from which the jury could make a reasonable inference in this case about the El Paso Aztecas' knowledge of what was happening and their agreement to participate in the scheme. First of all, the Barrio Azteca is not a benevolent organization. They're killers. They have kill teams. Benny's job, and this is in the testimony, his main order is to kill people in Juarez. He's a lieutenant. He's a very high-ranking member of this paramilitary organization where they follow orders of the officers. So, I mean, just as examples, we have Camelo saying he killed 800 people in seven months, that Benny ordered a quota of eight murders a day until they ran out of targets and they couldn't meet their quota because there weren't, like, enough people to kill. So we have just this immense murders and knowledge of what Benny is doing. And also the Aztecas in El Paso are involved in this. They're the ones that are sending the guns and ammunition south for these wars, and that's from 1727-28, 1804-13. So in addition to this sort of structural aspect and the way that the organization operates, we also have this overwhelming evidence of the communication between Juarez and El Paso, and there's extensive evidence of the coordination and there are sacred rules of communication that I want to direct the Court's attention in particular to 1873 and 1892. And both of those pages in the record and the testimony in there talk about this daily communication, a triangle of communication between the streets of Juarez, the streets of El Paso, and the leaders in prison. So this is not just, you know, getting together once a year to talk about how the Azteca is doing. This is very close coordination between what they're doing. So combined with the structural elements, the paramilitary nature, and this close communication, when that Azteca gets that order from Chino Valles that he needs to check on a registration, he knows they're not sending a Christmas card. They're going to kill that guy, and they're going to kill the people in the address. And we know from the structural nature of that, the structural nature of the organization, that he's going to follow that order, that he agrees with the enterprise's purposes. So just as this case is very similar to the case that's already been decided. There's been 35 defendants now tried. Actually, there's 34. One died. This case has been litigated over and over and over, and this Court has found that it's sufficient, that the same evidence is sufficient to prove the overt act and the conspirators in the United States. In this case, there's no evidence that the call was actually, that particular call was actually made. It's more of a generalized evidentiary notion that there was constant communication, and so therefore, in this instance, that likely, more probably than not, or even beyond a reasonable doubt, that the call was made. No, Your Honor. I think the evidence in this case is actually stronger than it was initially because the government had learned from the first count it needed to do a little bit better job. I direct the Court's attention to 1411 through 1412 and 1424 where it discusses, and I understand what defense counsel is arguing, but you taking the evidence in the light most favorable to the government, our theory is that this order was given days before the actual murders, that they were investigating this car for about a week. That's when Exhibit 5A to 5E starts. That's over a period of days in early March. So the order to Chino Valles, directing him and giving him the order to check on that registration and specifically Chino Valles, who's the conduit between the Juarez and the El Paso Aztecas, and giving him that order is an order in the days before. They're trying to find where this car is registered beforehand. So, you know, it doesn't need to be completed. It doesn't need to happen. Just the fact that there was an agreement made in the United States was sufficient. So I would encourage the Court to check out 1411 to 1412. It shows that that call was made. They were still looking for the car at the time that Chino Valles is given the order according to Camelo's testimony. So there is evidence in the record of that order that was given. The Court would like me to address next the next count as far as the counts, the Salcido murder counts per Jorge Salcido. And I would just briefly, I'm not sure how important it is in this case to direct, there was no general objection to the sufficiency of the ovens. This was never raised. We had very well-developed objections to the Rigo count, the count one and count five. I direct the Court's attention to 2357 to 6-2. Rule 29, when I read the Court's comments of I'm disagreeing with you, this is a conspiracy, and did reference all of the counts. I'm not sure the Court was making a finding under Rule 29 that it was evaluating the sufficiency of all the counts. And even then, Rule 29 is not a rule of preservation. That's what we find in Rule 51B, and that has to be brought to the courts of tension. So we are in a little bit of uncharted territory here. I couldn't find a case exactly on point, but we know from Puckett there are institutional reasons to encourage defense counsel to raise objections at the proper time so that the Court could have addressed these, and the parties could have addressed them in their argument like they did for count five, which was the jury was fully aware of the defense position about that there was no overt act and what the reasonable inferences would be and the government's arguments. And so there was nothing done as far as the preservation for that count. But whether a manifest necessity or a devoid of evidence standard or a plein air standard or a de novo standard doesn't really probably matter on the aiding and abetting. We have a very broad standard of what aiding and abetting is under Rosemont. It's where it's acts, encouragement, support, or presence. I mean, we have a bunch of killers coordinating on a radio about how they're going to kill these people in this white car, and Diaz says, hey, I'm on my way, I'm going to postpone my other murders for the day and bring my gun down and meet you all there to carry out these murders. I mean, that's enough under Rosemont. So it's just a very broad standard. There's also evidence that over the radio in Exhibit 5E that he was planning to, as soon as he finished that murder, go assist in the other murder. So it just shows the coordination between the two kinds of murders. So if the court doesn't have any questions, I would cede the rest of my time and ask the court to affirm the judgment with the exceptions of 6 and 8, 6, 7, and 8, where we agree with Mr. Lynch that those counts should be remanded so that the court can decide whether to impose life consecutively or concurrently. Thank you. Okay. Thank you, counsel. We have two minutes from Mr. Lynch in rebuttal. Thank you, Your Honor. Judge Englehart, I think I disagree with my friend on what 1411 and 12 shows. It doesn't show the call was made. It shows that Chino was directed to. And as I said in my brief, we can indulge the inference that he did follow the order and make the call. But we can't then create a chain of inferences to create a conspiracy that someone in the United States joined. And, yes, the Barrio Aztecas are not nice people. But we are a nation of laws, and we require proof of each individual's guilt. And that's what's missing in this case. They didn't prove that he was in a conspiracy to murder under 1956, that someone in the United States joined and an overt act was taken in the United States. And I think a similar thing is true of the aiding and abetting. I note that my friend says, come and join the murders, the murders. But what are charged are the deaths of Redfields and Martinez in one count and the deaths of Salcido in other counts. And on the Salcido counts, I do not believe that the evidence sufficiently shows that Mr. Diaz took an action and participated, facilitated. And so we would ask that he reverse the convictions on counts 5, 8, and 11 and vacate the sentences. Mr. Lynch, very quickly, I understood you earlier to say that the Rule 29 objection was just a blanket one that said Rule 29 with no specificity or limitation to counts 1 to 5. They went specifically, very in-depth on count 5. And the judge, in going back and forth a little bit, I believe it was with Mr. Morales here, talks about count 5. But then the judge says on page, it's ROA 2369 to 70 in my case, that I am denying the defendant's motions for acquittal on all counts. So the judge seemed to understand that you're making a general on everything and a specific argument on count 5. And where can I find the Rule 29 objection? It must immediately precede the court's ruling. So I don't recall the starting page, but it would probably, I would look at from 2365 or so. Thank you. Okay. Thank you, Counsel. We appreciate your arguments and your briefing. The matter will be considered submitted. And also, with regard to Mr. Lynch and Mr. Morales, you all are panel attorneys, as I understand it. And we appreciate your fine work on this case. This panel will be in recess until 9 a.m. tomorrow.